UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
HOWARD POWELL,

                    Petitioner,

    -against-

JOHN COLVIN, Superintendent of Five
Points Correctional Facility,

                    Respondent.
--------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
1:23-cv-1249 (CBA)

**AMON, United States District Judge:**

Howard Powell, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his state-court conviction of two counts of robbery under New York Penal Law § 160.15(3). Powell asserts that the preclusion of two expert witnesses from testifying at trial deprived him of his constitutional right to present a complete defense. (ECF Docket Entry ("D.E.") # 1 at 35-36.) For the reasons set forth below, the petition is DENIED.

## BACKGROUND[1]

Powell was indicted for two robberies. The first occurred on February 23, 2010. (D.E. # 9 at 4.) It involved the knifepoint robbery of Hilda Torres in the elevator of an apartment building in the Queensbridge Housing Complex. (Id.) The second robbery occurred two days later, on February 25, 2010. In that case, the victim, Esther Yan, was robbed in an elevator of a different building in the same Queensbridge Housing Complex. (Id. at 4-5.) Among the items taken from Yan was an Electronic Benefits Transfer ("EBT") card that the perpetrator attempted to use at a deli on the same day as the robbery. (Id. at 5.)

---

[1] Because Powell was convicted, I construe the facts in the light most favorable to the verdict. See United States v. Wasylyshyn, 979 F.3d 165, 169 (2d Cir. 2020).

1

Powell went to trial on the Yan robbery. Below, I summarize the pretrial and trial proceedings relevant to his claim that he was denied his constitutional right to a complete defense by the state court precluding him from calling two expert witnesses, one on false confessions and the other on eyewitness identifications.

## I.    Pre-Trial Matters

### A.  Pre-Trial Dunaway/Wade/Huntley Hearing

On June 2, 2011, a combined Dunaway/Wade/Huntley hearing was held in Queens County Supreme Court before Justice Steven Paynter. (D.E. # 1-9 at 11.) Justice Paynter denied suppression of Powell's post-arrest statements in the Yan robbery, a decision not challenged in this habeas petition. (Id. at 415-16.) He granted the suppression of the typed statement about the Torres robbery for failure to give statutorily required notice. (Id. at 414.) Justice Paynter also denied Powell's motion to suppress a photo array and lineup identification by Torres. (Id. at 415.) Powell did not challenge the identification procedures in the Yan case.

### B.  Severance of the Two Robbery Counts

Justice Ira Margulis, the trial judge, ordered the trials for the Yan and Torres robberies to be severed. (D.E. # 1-10 at 11-12.) He did so to allow Powell to testify at trial to refute the voluntariness of his Yan statement without opening the door on cross-examination to the Torres statement. (Id.)[2]

### C.  Suppression of Eyewitness-Identification Expert

Prior to trial, Powell moved to admit the testimony of Nancy Franklin, Ph.D. on the "reliability of eyewitness memory and identification." (D.E. # 1-10 at 384.) To undermine Yan's

---

[2] After his conviction, Powell agreed to plead guilty to the Torres robbery on the understanding that if the conviction was reversed on the Yan robbery, he could withdraw his plea on the Torres robbery. (D.E. # 14-5 at 183-84.)

lineup identification, Powell sought Dr. Franklin's testimony on topics such as "the low correlation between an eyewitness's confidence and accuracy," "the effect of high stress and the violence of the encounter on memory for faces," "the effect of a threat of a visible weapon on the identification of the person holding it," and "the tendency of persons of all races to be poorer at recognizing the faces of persons of other races." (Id. at 384-85.)

On December 11, 2013, Justice Margulis precluded Dr. Franklin's testimony in the Yan case but admitted it in the Torres case. (Id. at 12.) Relying on the two-step inquiry from People v. LeGrand, 8 N.Y.3d 449, 452 (2007), Justice Margulis found that, at the first step, there was enough evidence corroborating Yan's identification of Powell to render eyewitness expert testimony unnecessary. (D.E. # 1-10 at 12, 14.) Specifically, the Justice found that Yan's identification was corroborated by Powell's two post-arrest statements and surveillance footage from both the elevator robbery and the deli.[3] (Id. at 14.) By contrast, in the Torres case, the court concluded that with Powell's statement suppressed, there was insufficient corroboration of her identification of Powell, and the eyewitness expert was a necessary counterbalance. (Id.)

## D. Suppression of False-Confession Expert

Powell further sought to admit the testimony of Allison Redlich, Ph.D., a tenured associate professor at the School of Criminal Justice of the University of Albany, on the science of false confessions. (D.E. # 1-10 at 462-64.) Justice Margulis ordered a Frye[4] hearing "to establish: 1) whether Dr. Redlich, the proposed expert, [was] qualified to testify; 2) whether her testimony [was]

---

[3] These videos were provided to the Court on February 11, 2026. They do not appear on the docket because their large file size necessitated submission via the Court's digital-media evidence portal.

[4] Frye v. United States, 293 F. 1013 (Ct. App. D.C. 1923). "New York Courts have adopted the principles articulated in Frye for assessing whether proposed expert testimony is generally accepted in the relevant scientific community." LeGrand v. Lee, No. 13-CV-05282 (PKC) (KHP), 2016 WL 7468195, at *1 n.2 (S.D.N.Y. Dec. 28, 2016), report and recommendation adopted, No. 13-CV-5282 (PKC), 2017 WL 837683 (S.D.N.Y. Mar. 2, 2017) (citation omitted).

based on a scientific principle or procedure which has been sufficiently established to have gained general acceptance in the particular field in which it belongs." (D.E. # 1-10 at 16 (internal quotation and citation omitted), 21.)

After reviewing Dr. Redlich's qualifications and research, Justice Margulis qualified her as an expert (Id. at 44.) The remainder of the hearing addressed whether her proposed testimony conformed to what is generally accepted in the relevant scientific community, the Frye standard.

Dr. Redlich's testimony about false confessions was based largely on scenarios in which a suspect is interrogated or interviewed pursuant to the Reid Technique, the "most often cited" method of police interrogation in the United States. (Id. at 48-50.) She later conceded that she did not know if the New York Police Department employed the Reid Technique. (Id. at 91.) Nevertheless, she testified that "all interrogations are psychologically oriented using principles of . . . psychological influence of social influence," which overlap with the Reid Technique fundamentals. (Id. at 98.) Although she reviewed police reports, as well as Powell and Detective Grinder's Dunaway hearing testimony, (id. at 84), Dr. Redlich did not interview Powell before she testified at the Frye hearing, (id. at 92.)

Dr. Redlich's testimony addressed the dispositional and situational risk factors that might lead to a false confession. In her words, "[d]ispositional risk factors are . . . things like the age of the suspect, . . . whether or not the person has cognitive limitations, mental health problems, abuse problems, things that would render a suspect vulnerable in the interrogation room." (Id. at 57.) Situational risk factors involve the interrogation tactics and their effect on the suspect. (Id.)

She focused on dispositional risk factors, such as mental illness, which she claimed makes suspects more prone to confusion and concentration issues and less able to withstand interrogation tactics. (Id. at 57-58.) She also testified that, although the evidence is not "entirely clear," suspects

4

with depression and anxiety are more likely to give false confessions. (Id. at 59.) Similarly, cognitive limitations such as "mental retardation [and] intellectual disabilities" can make suspects more likely to have their will overborne by police or more eager to please people in positions of authority. (Id. at 60-61.) Finally, Dr. Redlich testified that there is "some literature" "that people with substance abuse problems are also at risk for false confessions." (Id. at 61.) Substance withdrawal likewise increases the likelihood that someone falsely confesses. (Id. at 61-62.) Similarly, long-term drug use, according to Dr. Redlich, can serve as something to blame when someone is falsely confessing. (Id. at 62.) As to situational risk factors, Dr. Redlich highlighted that lengthy interrogations and lying to suspects can increase the likelihood of false confessions. (Id. at 356-57.)

She also described "several studies" that showed confessions are "very weighty" and even the "gold standard of evidence" in jurors' minds. (Id. at 64.) She testified that a layperson would be unlikely to understand why someone would admit to a crime they didn't commit. (Id. at 357.) Despite this testimony, Dr. Redlich acknowledged that she could not testify that Powell's confession was false, as that was a question for the jury. (Id. at 75.)

After ordering briefing on the matter (id. at 292-93), Justice Margulis ruled that Dr. Redlich could not testify at trial, (id. at 362.) He relied on People v. Bedessie, 19 N.Y.3d 147 (2012), in which the New York Court of Appeals discussed the factors to consider when deciding whether to allow an expert to testify on false confessions. (Id. at 359.) He ruled that Powell failed to meet his burden of establishing that Dr. Redlich's testimony was scientifically reliable because research differed "as to why and which tactics present a danger of obtaining" false confessions. (Id.) He could not conclude that there was "reliable scientific data" or "consensus in the relevant scientific community." (Id. at 360.) Justice Margulis found it problematic that Dr. Redlich had "no personal

knowledge of the circumstances under which this particular defendant confessed," specifically that she was unaware of the type of questioning that New York City detectives used and that she couldn't establish that Powell's mental illness or "intellectual deficits" contributed to a false confession. (Id. at 360-61.)

## II.    Trial and Conviction

Powell went on trial on a single count of first-degree robbery under New York Penal Law § 160.15(3) beginning on July 21, 2014 before Justice Margulis of the Queens County Supreme Court. (D.E. ## 1 at 1; 14-1 at 313.)

### A. State's Case

The State's case consisted primarily of Yan's account of the robbery and Detective Grinder's account of the interrogation of Powell.

Yan testified that, in the afternoon of February 25, 2010, she went grocery shopping at a store near her home in Queens. (D.E. # 14-3 ("T.") at 644:20-645:3.)[5] On the way out of the store, the Defendant, approximately five feet away from her, asked her for a light. (Id. at 645:16-17, 646:19-21.) Yan noticed that he was a "tall black male" in a big grey jacket. (Id. at 647:11-14.) She believed he was in his mid-thirties. (Id. at 687:20.) A few minutes later, she went into the elevator of her building, and the Defendant followed her inside. (Id. at 650:2-4.) She recognized him as the same man who asked for a light outside the supermarket. (Id. at 651:1-3.) He was wearing a hat underneath a hood. (Id. at 651:14-21.) She saw a small blade in his right hand. (Id. at 652:17.) Once the elevator door closed, he lunged at her and pinned her against the wall, holding the blade near her face. (Id. at 653:11-13.) He threatened to kill her if she didn't give him money.

---

[5] The trial transcript appears in docket entries 14-1 through 14-5. For ease of reference, I cite to the transcript in the format (T. #:#), where the # symbol refers to page and line numbers. All other citations to non-transcript docket entries cite to the page of the docket, not to internal pagination.

(Id. at 653:15-16.) Yan screamed for help, but Powell put his finger down her throat. (Id. at 656:3-5.) Yan gave Powell her mother's EBT card and told him a PIN. (Id. at 656:23-657:3, 658:8-9.) After he left the elevator with the EBT card, she noticed that he was carrying an umbrella. (Id. at 662:10.)

She identified Powell as the robber from the elevator surveillance footage, which was played for the jury. (Id. at 668:1-14.) After the robbery, Yan called 911. (Id. at 670:7-9.) She confirmed her description of the robber—a tall, Black man wearing a hat and a grey, plaid, woolen jacket, (id. at 670:16-24, 701:23)—that she provided in her 911 call, which was played for the jury, (id. at 675:5-24.) She estimated that he was about six feet tall with a skinny to medium build. (Id. at 688:11-21.)

After Yan reported the robbery to the police, she was informed that someone had attempted to use her mother's EBT card at a local deli. (Id. at 678:14-24.) She called Detective Joseph Grinder and shared this information with him. (Id. at 679:6-11.) On March 2nd, Yan went to the 114th Precinct to view a lineup. (Id. at 680:15-21.) She selected Powell in the lineup, photos of which were admitted into evidence. (Id. at 682:25-684:21.)

Detective Grinder testified to his investigation of the case and his two-day interrogation of Powell. Detective Grinder began interrogating Powell on March 1st around 6:30 pm. (Id. at 757:16.) Detective Grinder testified that he mirandized Powell at the start of their interaction, (id. at 758:13-15), and that Powell initialed a Miranda card, (id. at 761:17-20.) When Detective Grinder brought up that he was investigating robberies, Powell became "agitated" and said he had not committed any robberies. (Id. at 777:15-19.) Later in the evening, Detective Grinder testified that Powell was not in distress but requested his medications for the first time. (Id. at 780:12-15, 781:12-15.) Around 11:05 PM, Detective Grinder obtained Powell's medications from Powell's

7

friend. (Id. 782:4-22.) Detective Grinder testified that he did not recall whether he gave Powell his medication, nor did he document as much. (Id. at 872:17, 875:24-876:1.) Because it was too late in the day to conduct a lineup, Detective Grinder then took Powell to Central Booking around 11:50 pm. (Id. at 779:10-17, 783:17.)

The next morning, Detective Grinder brought him to the 114th Precinct, (id. at 798:20), and gave him coffee and a bagel, (id. at 800:2-4.) Detective Grinder asked if Powell was ready to stand in a lineup. (Id. at 802:22.) At that point, Powell admitted to the robbery, claiming that he was "messed up on drugs" and followed a woman into her building. (Id. at 803:2-4.) Powell indicated a desire to commit his admission to writing. (Id. at 804:2-5). He wrote the following statement, which was admitted into evidence:

> Howard Powell was using drugs for two weeks and was doing really bad. I did a robbery and I am very sorry. Please forgive me. I want to help NYPD, but only you can help me with this. I was really messed up on drugs and I am sorry if I've hurt anyone.

(Id. 805:5-19, 809:12-16.)[6] Powell refused to sign the typed statement. (Id. at 805:2-5.)

After he conducted the lineup, Detective Grinder informed Powell that he had been selected as the robber. (Id. at 820.) According to Detective Grinder, Powell then expressed a desire to give "his side of the story." (Id. at 821:1-3.) At trial, Detective Grinder summarized Powell's verbal admission to the Yan robbery as follows:

> [H]e stated that he followed a girl into her building. He stated that followed -- his words, not mine -- an oriental girl into her building. That he had went into the elevator with her. He stated, that one gave me a fight for my money. That all he got from her was an EBT card or card with no numbers on it. . . . He said he probably had a razor knife on him

---

[6] Powell's original, handwritten statement was redacted to remove reference to the Torres robbery for the jury. The original read as follows:
> Howard Powell, Was using drugs for two weeks and was doing really bad. I did a few robbery and I am very sorry please forgive me I want to help N.Y.P.D. but only you can help me with this, I was really MESSED UP on DRUGS and I am sorry if I've hurt any one.

(D.E. # 1-9 at 6 (emphasis in the original).)

because he usually carries one. He said the projects are dangerous. . . . He said he didn't pull it out, he didn't use it.

(Id. at 821:6-822:2.) Powell asked Detective Grinder to type these statements for him because he did not write well. (Id. 822:20-22.) Powell then reviewed the typed statement and signed it. (Id. at 824:14-20.) The typed report was admitted into evidence at trial. (Id. 825:8.)[7] Detective Grinder testified that Powell did not appear to be in physical or mental distress during these discussions, and he bought Powell lunch before he made his second statement. (Id. at 835:22-836:11.)

The State's case included testimony from the cashier at the deli, who was present when Powell attempted to use Yan's EBT card. (Id. at 586:1-591:19.) The cashier was unable to identify the Defendant at trial. (Id.) During the cashier's testimony, the State introduced the surveillance video from the deli. (Id. at 588:21-25.) The State also called an assistant superintendent of the housing complex where the robberies occurred, (id. at 600-606), and the State played for the jury the surveillance video from the elevator where Yan was robbed, (id. at 603:17-18.) The State also elicited testimony from an arresting officer, (id. at 613:1-12.), and the Assistant District Attorney who conducted the lineup, (id. at 987:8-1000:5.)

## B. Defense Case

The Defense case consisted principally of the Defendant's testimony. Powell denied committing the Yan robbery. (Id. at 1064:23-24.) He provided an account of his interrogation that

---

[7] The typed report read as follows:

> Sometime toward the end of last week I followed this oriental girl from the 40 side of 10 Street into her building. She was carrying groceries. I went into the building and then into the elevator with her where I robbed her. This one gave me a fight for my money and tried to push me away. I kept pushing her but I didn't try to hurt her. I usually keep a razor knife in my pocket but didn't think I had time to get it out. The only thing I got from her was an EBT card with no numbers on it. I was using drugs for two weeks and was doing really bad. I did a few robberies and I am very sorry. Please forgive me. I want to help the NYPD but only you can help me with this. I was really messed up on drugs and I am sorry if I've hurt anyone.

(D.E. # 1-9 at 7.)

differed substantially from that of Detective Grinder. Powell testified that he was not read his rights or mirandized until March 2nd, after his two confessions already occurred. (Id. at 1060:1-5, 1072:9-18.) He also recounted that he had been using crack cocaine and heroin most of the day he was arrested. (Id. at 1058:5-8.) According to Powell, he told Detective Grinder that he needed his medications because he was experiencing "nervousness" about being arrested. (Id. at 1061:1-6.) Powell testified that, in the evening, he had a seizure and urinated on himself and the floor, (id. at 1062:12-25), and that Detective Grinder yelled at him for urinating, (id.)

Powell said that he was not given his medications, despite asking for them two more times (Id. at 1062:2-4.) He testified that he was told that if he kept asking and not cooperating, he wouldn't go before a judge for four or five days. (Id.) According to Powell, after Detective Grinder returned with the medication, he placed it at the end of the interrogation room table and told Powell he could have it in exchange for his cooperation with the investigation. (Id. at 1064:7-10.) Powell maintained that he was never given his medication for the duration of the interrogation. (Id. at 1067:23.)

Powell claimed that he did not eat at all on March 1st after he was arrested, (id. at 1061:24.), nor was he given breakfast or lunch on March 2nd, as Detective Grinder had testified, (id. at 1065:24-1066:1.) He feared he would have another seizure. (Id. at 1066:22-24.) During this time, Powell was handcuffed to the wall—a fact that Powell and Detective Grinder both confirmed. (Id. at 800:7-21.)

Powell testified that he only made the first, general statement admitting to the robberies to "try to please Detective Grinder so I could get my medication and some food." (Id. at 1068:25-1069:1.) Powell disputed ever making the second statement. (Id. at 1070:1-3.)

10

Powell also testified about his struggles with mental health and substance abuse. Powell explained that he was in special education through the first day of ninth grade, when he dropped out of school. (Id. at 1049:1-15.) He learned to read at age 36. (Id. at 1050:1-2.) He suffered from depression for which he sought treatment (See id. at 1051:16-24.) In addition to depression, Powell said he had been diagnosed with schizophrenia, an "emotional disorder," and panic attacks, for which he was medicated. (Id. at 1054:5-6, 1056:13-19.) Powell also claimed he further suffered from seizures, diabetes, hypertension, and asthma, for which he is on medication. (Id. at 1054:13-1055:7; see also D.E. # 1 at 6-7.)

### C. Rebuttal

The State called a supervising officer who testified that no one had a seizure or urinated in the Precinct on the night Powell was there, (T. 1303:21-1305:11), an officer from Central Booking who testified that Powell would have eaten there, (see, e.g., id. at 1312:8-13), and a New York Department of Corrections Investigator who laid the foundation to introduce Powell's recorded phone calls while incarcerated at Rikers Island, (id. at 1353:5-1356:16.) The State also called a Detective, who was present for Powell's interrogation and largely corroborated Detective Grinder's account. (See, e.g., id. at 1365:9-18.)

### D. Summations

The Defense's summation primarily attacked the reliability of Powell's confession and Yan's eyewitness identification of Powell. Defense counsel criticized the lack of documentation of what occurred during Powell's interrogation and encouraged the jurors to weigh Powell's account heavily. (Id. at 1477:1-1479:17.) He emphasized how Powell's seizure, (id. at 1480), his mental health issues, (id. at 1485), drug use, (id. at 1488), and lack of medication, (id. at 1502), and food, (id. at 1504), affected the voluntariness of his statement. Defense counsel also challenged

Yan's identification, emphasizing that she made a cross-racial identification, (id. at 1525), in a highly traumatic moment, (id. at 1526), both factors which could undermine the reliability of the identification, (id. at 1529.)

The State's summation emphasized the length of time that Yan had to observe the Defendant in the elevator, which made her identification of him more reliable. (See, e.g., id. at 1552.) The State's summation also highlighted that Yan had an additional opportunity to identify the Defendant outside of the grocery store before the robbery, (id. at 1561,) and reiterated that her description of the robber matched the person in the surveillance videos, (id. at 1571-76), and that she eventually picked Powell out of a lineup, (id. at 1580.) The summation also attempted to undermine Powell's narrative about how he came to confess by restating that he would have been fed and given medicine per Department policy established at trial. (See, e.g., id. at 1599-1610.)

### E. Jury Instructions

As relevant to this habeas petition, Justice Margulis charged the jury that they must find the Defendant's statement voluntary. (Id. at 1644:13-17 ("[E]ven if you find that defendant made a statement, you still may not consider it as evidence in the case unless the People have proven beyond a reasonable doubt that the defendant made the statement voluntarily.").) He encouraged the jury to consider the "defendant's age, intelligence and physical and mental condition, and the conduct of the police during their contact with the defendant." (Id. at 1647:7-10.) Justice Margulis also charged the jury on evaluating the truthfulness of an eyewitness identification and specifically instructed the jury to consider the "mental, physical, and emotional state of the witness before, during, and after the observation" and "whether there is a difference in race between the defendant and witness who identified the defendant." (Id. at 1637:17-1640:12.)

### F. Conviction

Powell was convicted on November 6, 2014. (D.E. # 1 at 1.) In view of Powell's substantial criminal record, Justice Margulis sentenced Powell to a prison term of twenty-five years to life. Powell pled guilty to the severed robbery count (the Torres robbery) and received a concurrent sentence of twenty years, conditioned on an assurance that if the trial conviction was reversed, his plea conviction would be too. (Id. at 4.)

### III.   Direct Appeal

#### a.   Appellate Division

Powell appealed to the Appellate Division, Second Department. In a counseled brief, he argued that (1) the preclusion of Dr. Redlich's testimony about false confessions violated his federal constitutional right to present a defense, and (2) that the preclusion also violated various state evidentiary rules. (Id. at 27-28.)

On June 22, 2018, the Appellate Division affirmed the judgment of conviction. (D.E. # 1-9 at 4.) Without directly addressing Powell's federal claim, the court found that the lower court properly exercised its discretion in precluding Dr. Redlich's testimony under Bedessie, 19 N.Y.3d 147 (2012), because Powell "failed to establish that his proffered expert testimony was relevant to the specific circumstances of this case." (Id.)

#### b.   Court of Appeals

The New York Court of Appeals ("the Court") granted leave to appeal on April 26, 2019. (Id. at 3.) On November 18, 2021, the Court published its opinion affirming the trial court's evidentiary decisions. (D.E. # 1-2 at 2.)

##### i.   Preclusion of False-Confession Expert Testimony

The Court found no abuse of discretion as a matter of law in precluding Dr. Redlich's testimony. (Id. at 2.) In addition to applying the Frye standard to decide whether methodologies

13

and hypotheses are generally accepted in a relevant scientific community, the opinion held that the trial court must also apply Bedessie to "determine whether the same proffered testimony was 'relevant to the defendant and interrogation before the court.'" (Id. at 16 (citing Bedessie, 19 N.Y.3d at 161).) Expert testimony on false confessions, the Court held, "is meant to be used as an informational tool to educate the jury on the causal connection between relevant factors and false confessions outside their ken" but must be delivered "without opining on the particular facts of the case." (Id. at 17.)

Because Dr. Redlich could not establish that her expertise on police interrogations related to the interrogation that occurred in this case, the Court found that the trial court was "well within its province" to preclude her testimony. (Id. at 20.) Specifically, she had "difficulty" explaining how "her testimony was at all relevant to the circumstances presented by defendant's interrogation." (Id. at 18.) On this point, the Court found her reliance on the Reid Method problematic, since she could not be sure that method was used in this case. (Id. at 19.) Because her testimony was not anchored to the interrogation at issue, it rendered her testimony general such that some of it "required no explanation to a jury." (Id.) General testimony about psychological effects of interrogation tactics, the Court found, is "entirely consistent with the commonsense ability of the jury." (Id.)

The Court further found that Dr. Redlich's testimony about Powell's dispositional risk factors that could have made him more likely to falsely confess was insufficiently tethered to the facts of the case. (Id. at 21-22 ("[D]efendant's substance abuse was not linked to the circumstances of the confession, as there was no evidence that he was either intoxicated or in withdrawal at the time he was questioned.").) As to the link between mental illness and false confessions, the Court

14

emphasized that Dr. Redlich herself admitted the science was not yet firm. (Id. at 22.) In sum, the Court held that:

> The trial court properly recognized that proving false confessions occur, is not the equivalent of accepting Dr. Redlich's broad, unmoored testimony on the science of false confessions and given her difficulty in explaining the external validity of the studies, her imprecise testimony was insufficient to sustain the burden of establishing general acceptance of the psychological principles she was advocating.

(Id. at 23.)

### ii. Preclusion of Eyewitness-Identification Expert Testimony

The Court held that there was no abuse of discretion in precluding the eyewitness identification expert. (Id. at 25.) The Court found that the lower court properly followed the standard articulated in LeGrand, 8 N.Y.3d at 457, since the case did not turn solely on the accuracy of Yan's identification but was corroborated by Powell's confessions and the surveillance videos. (Id.)

### iii. Dissent

Judge Jenny Rivera issued a dissent for the three-judge minority. She articulated the issue on appeal as "whether the denial of defendant's motion to present expert testimony at trial on false confessions or on cross-racial identifications violated his right to present a defense relating to his innocence." (Id. at 26.) Judge Rivera concluded that excluding Dr. Redlich's testimony on false confessions was an abuse of discretion, because the lower court's analysis exceeded the scope of Bedessie and Frye by "question[ing the] foundation, the fit between the proffered testimony and the facts of the case, and the methodologies used by social sciences researchers." (Id. at 27.) The lower court should have ended its inquiry, she argued, at whether the science of false confessions was generally accepted in the relevant scientific community. (Id.)

Judge Rivera also opined that it was an abuse of discretion for the trial court to preclude Dr. Franklin's testimony about eyewitness identifications. (Id. at 66-67.) She concluded that this was an appropriate case, under LeGrand, to admit such testimony. (Id.) She found the evidence that the majority described as corroborating to be unconvincing, especially because the surveillance videos did not clearly depict the robber's face. (Id. at 69). She argued it was improper for the trial court to consider the corroborative effect of "hotly-contested evidence" before trial and that such weighing of credibility and factfinding was for the jury—who would have benefited from learning about how cross-racial and high-stress identifications can be unreliable. (Id. at 70-71.)

## STANDARD OF REVIEW

Certain well-settled principles govern this case. First, "[f]ederal habeas corpus relief does not lie for errors of state law." Lewis v. Jeffers, 497 U.S. 764, 780 (1990). Second, where the state court decided the constitutional issue on the merits, the federal court's authority to review the decision is limited under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner only where the state-court decision was "was contrary to, or involved an unreasonable application of," clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1).

A state-court decision is "contrary to" clearly established federal law if it (1) "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law," or (2) "decides a case differently than the [Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). "An unreasonable application of" federal law occurs if the state court's "application of clearly established federal law was objectively unreasonable," Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000) (quoting Williams, 529 U.S. at 409), or if it

16

"fails to extend a principle of clearly established law 'to situations which that principle should have, in reason, governed,'" Tueros v. Greiner, 343 F.3d 587, 591 (2d Cir. 2003) (quoting Kennaugh v. Miller, 289 F.3d 36, 45 (2d Cir. 2002)). "[A] state court's ruling must be 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Shoop v. Hill, 586 U.S. 45, 48 (2019) (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)).

Here, Powell first challenges whether the AEDPA standard of review governs. He contends that the appropriate standard is de novo review because the courts below failed to reach the merits of his federal constitutional claim. (D.E. # 1 at 33-35.)

The Supreme Court has held that "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted." Johnson v. Williams, 568 U.S. 289, 301 (2013). There, the Court enunciated several "rare cases" in which the presumption of a merits adjudication may be rebutted, including (1) where the state law is less protective or "quite different" than the federal standard; (2) where federal precedent or the constitutional provision at issue were mentioned in passing in the petition; (3) where the state courts may have accidentally overlooked the federal claims; and (4) where the petitioner fails to exhaust state remedies. Id. at 301-303. None of these factors are present here.

First, New York's evidentiary laws are not "quite different" or less protective than the federal constitutional rights asserted. The second and third circumstances likewise do not apply here. Powell raised his constitutional claims centrally at every stage of this litigation, and it cannot be said he buried them in a footnote or string cite. (See, e.g., D.E. # 1-9 at 464, 468-69.) He does not adduce any evidence that the Court of Appeals overlooked the federal claims he so squarely

17

presented. That the constitutional claims were decided is also evidenced by the dissent. That dissent explicitly identifies the issue: "At issue on appeal is whether the denial of defendant's motion to present expert testimony . . . violated his right to present a defense relating to his innocence." (D.E. # 1-2 at 26.) The majority opinion does not dispute the dissent's statement of the issue.

Finally, the fourth factor does not apply, as Powell has exhausted state remedies by presenting his constitutional claims to both the Appellate Division and the Court of Appeals. (See D.E. # 9 at 17-18.) As none of the factors that could rebut the Williams presumption apply here, I review the Court of Appeals decisions below under AEDPA deference, rather than de novo review.

In applying AEDPA deference on habeas review, I review the "last reasoned decision" by the state court. Ylst v. Nunnemaker, 501 U.S. 797, 804 (1991); Jones, 229 F.3d at 118. Here, the last reasoned decision was that of the Court of Appeals.

## DISCUSSION

Powell raises two grounds that rest on the same constitutional claim: that the trial court's preclusion of expert testimony on both false confessions and eyewitness identification violated his constitutional right to put on a complete defense.

### IV.    Constitutional Right to a Complete Defense

Powell properly asserts a recognized federal right. The right to present a complete defense "is based on clearly established federal law as determined by the Supreme Court." Scrimo v. Lee, 935 F.3d 103, 112 (2d Cir. 2019); Crane v. Kentucky, 476 U.S. 683, 690 (1986) ("[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.") (internal quotation omitted). The opportunity to call witnesses for that defense is a critical facet of the constitutional right: "Few rights are more fundamental than that of an accused

18

to present witnesses in his own defense." Chambers v. Mississippi, 410 U.S. 284, 302 (1973); California v. Trombetta, 467 U.S. 479, 486 n.6 (1984) ("[C]riminal defendants are entitled to call witnesses on their own behalf . . . ."). This right is "secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment." Washington v. Schriver, 255 F.3d 45, 56 (2d Cir. 2001) (citations omitted).

"[T]he right to present relevant testimony is not without limitation," and "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." Rock v. Arkansas, 483 U.S. 44, 55 (1987) (internal quotation and citation omitted). Those legitimate interests include "evidentiary and procedural rules 'designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" Scrimo, 935 F.3d at 112 (quoting Chambers, 410 U.S. at 302); see also Taylor v. Illinois, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.").

As an initial matter, "[t]here is no Supreme Court case recognizing a right to introduce [false-confession expert testimony] evidence." Mutterperl v. Griffin, No. 13-CV-6028 (RJD), 2019 WL 3859400, at *9 (E.D.N.Y. Aug. 16, 2019). There is likewise no Supreme Court case recognizing such a right for eyewitness identification expert testimony. Therefore, the state-court decision was not "contrary to" clearly established Supreme Court law, and my analysis is constrained to whether the state-court decision involved an "unreasonable application" of clearly established Supreme Court law or whether it "fails to extend a principle of clearly established law "to situations which that principle should have in reason governed." Tueros, 343 F.3d at 591 (quoting Kennaugh, 289 F.3d at 45).

19

**V.        There Was No Unreasonable Application of Supreme Court Law**

"[W]hen a trial court's evidentiary exclusions take on constitutional dimensions . . . '[the court] must examine the stated reasons for the exclusion and inquire into possible state evidentiary law errors that may have deprived the petitioner of a fair trial.'" Scrimo, 935 F.3d at 114-15 (quoting Schriver, 255 F.3d at 57); see also Wade v. Mantello, 333 F.3d 51, 59 (2d Cir. 2003). Examining whether there were "state evidentiary law errors at the trial level" assists the reviewing court in "ascertain[ing] whether the [Court of Appeals] acted within the limits of what is objectively reasonable." Hawkins v. Costello, 460 F.3d 238, 244 (2d Cir. 2006), cert. denied, 549 U.S. 1215 (2007) (first alteration in original) (quoting Jones, 229 F.3d at 120); Animashaun v. New York, No. 21-CV-2597 (KAM), 2024 WL 4266003, at *26 (E.D.N.Y. Sept. 23, 2024).

"If potentially exculpatory evidence was erroneously excluded, we must look to whether the omitted evidence evaluated in the context of the entire record creates a reasonable doubt that did not otherwise exist." Hawkins, 460 F.3d at 244 (cleaned up); see also Wade, 333 F.3d at 59 (applying "[t]his test . . . post-AEDPA"). But "if the evidentiary ruling was correct pursuant to a state evidentiary rule, our inquiry is more limited. We consider whether the evidentiary rule is arbitrary or disproportionate to the purposes it is designed to serve." Hawkins, 460 F.3d at 244 (cleaned up). A state evidentiary rule is "unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." United States v. Scheffer, 523 U.S. 303, 308 (1998).

There is a high bar to finding an unreasonable application of federal law in this context. "Only rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." Nevada v. Jackson, 569 U.S. 505, 509 (2013); Vega v. Walsh, 669 F.3d 123, 126 (2d Cir. 2012) ("[S]tate trial court evidentiary

20

rulings generally are not a basis for habeas relief."). That is so because 'habeas corpus relief does not lie for errors of state law, . . . and that necessarily includes erroneous evidentiary rulings." Hawkins, 460 F.3d at 244 (internal quotations and citations omitted).

### A.  There Were No State Law Evidentiary Errors

### i.  False-Confessions Expert

The Court of Appeals' decision in Bedessie is the controlling New York authority as to when and whether to admit expert testimony on false confessions. See 19 N.Y.3d 147. That case observes that "in a proper case expert testimony on the phenomenon of false confessions should be admitted," id. at 149, but notes that admissibility of expert testimony remains a matter of the trial court's discretion, id. at 156. Bedessie emphasizes that an "expert may not testify as to whether a particular defendant's confession was or was not reliable, the expert's proffer must be relevant to the defendant and interrogation before the court." Id. at 161.

The Court of Appeals' decision here hewed closely to Bedessie's controlling standard. The Court found for a number of reasons that the trial court acted within its discretion by disallowing Dr. Redlich's testimony. (D.E. # 1-2 at 2, 15, 24.) The Court emphasized that, in addition to meeting the requirements of Frye, false-confession testimony must also be relevant to the particular defendant and interrogation. (Id. at 15.) Indeed, the Court clarified that the Bedessie inquiry is in addition to, not part of, the Frye inquiry. (Id. at 24 ("[A]s we held in Bedessie, the trial court may not abdicate its responsibility to determine the relevancy of the proffered educational testimony to the particulars of the individual case, to wit, defendant and the interrogation before the court.").)

The Court's holding that it was not an abuse of discretion for the trial court to find that Dr. Redlich's proposed testimony was not relevant to Powell's interrogation was entirely

21

reasonable. Powell testified that he made the first statement confessing to the robberies to "try to please Detective Grinder so [he] could get [his] medication and some food." (T. 1068:25-1069:1.) If the interrogating officers did indeed withhold food and medication, that would be quite distinct from the type of psychological techniques that Dr. Redlich testified about at her Frye hearing. In the hearing, she named "situational risk factors," including drawing out an interrogation, lying to suspects, and leaking information about the case to them, that might lead a suspect to falsely confess. (D.E. # 1-10 at 62-64.) But there was no evidence that those risk factors were circumstances present in Powell's interrogation. Instead, Dr. Redlich testified about the general phenomenon of false confessions when officers employ the Reid Technique or something similar, claiming that any technique would be "psychologically based." (Id. at 131.) But without proof of what technique the detectives who interrogated Powell actually used, it was reasonable to conclude that her testimony about the psychological factors that risk eliciting false confessions was not relevant here. As such, the Court did not err in concluding that her testimony about "situational risk factors" was in the main not relevant to Powell's first statement. (See D.E. # 1-2 at 18-20.)

As to his second statement, the Court rightly highlighted that Powell denied making this statement. (T. 1070:1-3.) Any "expert testimony regarding dispositional and situational factors that create a risk of a false confession" therefore had "no relevance to the oral or written version of that statement." (D.E. # 1-2 at 18.)

It was also reasonable for the Court to conclude that it was not abuse of discretion for the trial court to find that Dr. Redlich's testimony would not have aided the jury. "'It is for the trial court in the first instance to determine when jurors are able to draw conclusions from the evidence based on their day-to-day experience, their common observation and their knowledge,

and when they would be benefited by the specialized knowledge of an expert witness.'" People v. Lee, 96 N.Y.2d 157, 162 (2001) (quoting People v. Cronin, 60 N.Y.2d 430, 433 (1983)). The Court correctly concluded that assault[8] and withholding of food and medication—as Powell alleged occurred—is "outright coercion" that a jury well understands could produce a false confession. (D.E. # 1-2 at 18.) Because jurors could have drawn on their day-to-day experiences to determine whether that outright coercion occurred and whether it induced a false confession from Powell, it was not unreasonable to conclude that Dr. Redlich's testimony would not have helped the jury reach the conclusion that Powell falsely confessed.

Finally, the trial court did not err by expressing reservations about studies on which Dr. Redlich relied in reaching her conclusions about false confessions. (See D.E. # 1-10 at 353-54.) Dr. Redlich admitted that one study, the Alt Key Paradigm, on which she relied for her own research, has "been criticized and is really no longer used," (id. at 189), and the other, the Cheating Paradigm, induces study subjects to commit the bad act and then self-report whether they did that act, (see id. at 176-77, 180-81.) Based on Dr. Redlich's own hearing testimony as to the problematic application of these studies to false confessions, it was within the trial court's discretion to preclude her from testifying at trial. Therefore, it was not without justification that the Court found that testimony based on such studies posed a risk of confusing or misleading the jury. (D.E. # 1-2 at 22-23.)

In applying AEDPA deference, it is not my role to question how the Court of Appeals construes its own precedent. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law

---

[8] In a pre-trial hearing, Petitioner testified that Detective Grinder smacked him once immediately after the seizure and another "four or five times" during the two-day interrogation. (D.E. # 1-9 at 378-79.)

23

questions."). I find that no state evidentiary errors occurred with respect to the preclusion of Dr. Redlich's testimony. Certainly, Powell has not shown that the exclusion of this testimony was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Shoop, 586 U.S. at 48 (internal quotation omitted).

### ii. Eyewitness-Identification Expert

LeGrand is the New York Court of Appeals' decision that controls when and whether to admit eyewitness-identification expert testimony. See 8 N.Y.3d at 456. That case holds "that expert testimony regarding the factors that affect the accuracy of eyewitness identifications, in the appropriate case, may be admissible in the exercise of a court's discretion" and that "there are cases in which it would be an abuse of a court's discretion to exclude expert testimony on the reliability of eyewitness identifications." Id. Where a "case turned solely on the accuracy of the witnesses' identification," LeGrand instructs that it would be an abuse of discretion to preclude expert testimony on eyewitness identification accuracy. Id. at 457. By contrast, when there exists "corroborating evidence connecting [the] defendant to the commission of the crime charged," that testimony may be admissible, subject to the court's discretion. Cf. id.

Again, the Court of Appeals did not err when it found Justice Margulis was acting within his discretion by disallowing Dr. Franklin's testimony. (D.E. # 1-3 at 24-25.) The Court was correct to note that the lower court clearly grasped the distinction between cases with and without corroborating evidence that was drawn in LeGrand. Justice Margulis accordingly admitted Dr. Franklin's testimony in the Torres case because that case turned only on Torres's identification of Powell, but precluded it in the Yan case, where there was evidence corroborating her identification of Powell. (D.E. # 1-10 at 12, 14.)

24

Powell argues that in reaching this conclusion, the trial court, and later, Court of Appeals "greatly overstated the corroboration provided by other evidence," "making improper assumptions about the relative weight of evidence." (D.E. # 1 at 61 (cleaned up).) Powell mischaracterizes the state-court opinions. In relying on LeGrand, the courts did not impose "a strict two-part test that initially evaluates the strength of the corroborating evidence," but instead properly "read [the case] as enumerating factors for trial courts to consider in determining whether expert testimony on eye-witness identification would aid a lay jury in reaching a verdict." People v. McCullough, 27 N.Y.3d 1158, 1161 (2016) (internal quotations omitted). Justice Margulis merely noted that Powell's statements admitting to the Yan robbery were "admissible at trial" and found that the surveillance videos "provide[d] additional support for the People's case." (D.E. # 1-10 at 14 (internal quotations omitted).) These pieces of evidence, he noted, were "sufficient" corroborating evidence "to obviate the need for expert testimony." (Id.) Justice Margulis did not evaluate the strength of the evidence, rather, he correctly determined that there was sufficient evidence corroborating Yan's identification to render Dr. Franklin's testimony superfluous.

The Court of Appeals likewise properly found there was enough evidence, without Dr. Franklin's testimony, for the jury reach a verdict. The Court found that Yan's identification "was corroborated by the surveillance video and defendant's statements." (D.E. # 1-2 at 25.) Discussing the elevator video, the Court noted: "Although the perpetrator's face is not clearly visible . . . the film depicts a tall man wearing a hooded, dark-colored coat and hat, carrying a large black umbrella with a curved handle." (Id. at 3.) Discussing the deli footage, the Court described the store as "well-lit" and highlighted that "portions of the man's face" were visible from "multiple angles." (Id.)

I have reviewed the lineup and video surveillance footage. The Court's conclusion that the two surveillance videos corroborate Yan's identification is well founded. The EBT card user in the surveillance footage from the deli—which contains a view of the user's face—bears a marked resemblance to the picture of Powell in the lineup. Although the elevator video surveillance is less clear, the robber is carrying the same umbrella and is dressed identically to the person using the stolen EBT card in the deli moments later. Powell's admissions provided further corroboration for purposes of LeGrand. "Since there was sufficient corroborating evidence connecting [Powell] to the crime, and there was nothing an expert could have added that would have aided the jury, the Court cannot say that the trial court's evidentiary ruling was erroneous as a matter of New York law." Redding v. New York State Dep't of Corrs., No. 17-CV-7075 (CS) (JCM), 2020 WL 614835, at *16 (S.D.N.Y. Feb. 10, 2020).

I do not find that the state courts committed any evidentiary errors by precluding Dr. Franklin from testifying. More to the point, Powell has failed to show that the exclusion of Dr. Franklin's testimony was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Shoop, 586 U.S. at 48 (internal quotation omitted).

### B. The Omitted Evidence Would Not Have Created a Reasonable Doubt That Did Not Otherwise Exist

Even if I agreed with Powell that the state courts erred by precluding the two expert witnesses, any error was harmless. To demonstrate that a defendant's right to present a defense was violated, the evidence erroneously excluded, when "evaluated in the context of the entire record[, must] create[] a reasonable doubt that did not otherwise exist." Justice v. Hoke, 90 F.3d 43, 47 (2d Cir. 1996) (cleaned up). That is not the case here. Neither expert witness's testimony would have created a reasonable doubt that did not otherwise exist. That is so because of the

26

strength of the evidence against Powell and because the proposed expert witness testimony would have only duplicated the points already made to the jury in testimony, cross-examination, summations, and jury instructions.

### i. False-Confessions Expert

The first expert witness, Dr. Redlich would have testified to the situational and dispositional factors that led Powell to confess to a crime he allegedly did not commit. (See supra Section I.D.) But there was evidence adduced at trial that contradicted the false confession theory. Specifically, Powell's written statement contained specific details about the robbery that eventually matched Yan's account at trial, such as her race, that she was carrying groceries, the location of the robbery, the weapon he used, and the fact that he obtained an EBT card without numbers on it. (See supra n.6.) That he knew this information undermined his theory that he confessed to a crime he did not commit.

Moreover, Powell "fully utilized the meaningful opportunities afforded him to present the circumstances under which he made his statements and to challenge their voluntariness, both in a pre-trial Huntley hearing, . . . and at trial through [his own testimony about his statements,] cross-examination of the state's witnesses and a vigorous summation by counsel." See Mutterperl, 2019 WL 3859400, at *9. Before trial, the court conducting the Huntley hearing considered and rejected Powell's argument after both Powell and Detective Grinder testified to the circumstances of his confession. (See generally D.E. # 1-9 at 414-16.)[9]

At trial, Powell directly and frequently advanced the theory that his substance use, mental and physical health issues, and the circumstances of his interrogation led him to falsely confess to the robbery. His opportunities to present the false-confession theory included Powell's own

---

[9] Powell does not challenge the decision made after this hearing.

testimony that he falsely confessed, (see, e.g., T. 1070:1-3.); cross-examination of Detective Grinder about the lack of record of the interrogation and Powell's consumption of medication and food during the interrogation, as well as his demeanor, (see, e.g., id. at 855:19-24, 856:3-21, 863:1-867:7); and, defense counsel's "vigorous summation, which clearly and forcefully discussed the theory that" Powell falsely confessed, Schriver, 255 F.3d at 60; (see, e.g., T. 1481:16-1482:2, 1483-85, 1489, 1495:10-1496:5.)

Finally, Justice Margulis's jury charge repeatedly instructed that a statement must be found voluntary beyond a reasonable doubt and discussed what factors to consider when deciding whether a statement was made voluntarily. (T. 1644-49.) In sum, the jury was presented with ample information about the circumstances of Powell's confessions and guidance about how to weigh that information in deciding his guilt. Because the false-confession theory was brought before the jury and the evidence undercutting the theory was strong, admitting Dr. Redlich's testimony would not have created a reasonable doubt that did not otherwise exist.

### ii.    Eyewitness-Identification Expert

Likewise, admitting Dr. Franklin's testimony would not have created a reasonable doubt that did not otherwise exist, both because Powell was able to vigorously challenge Yan's identification without expert testimony and because the state presented ample credible evidence that supported Yan's identification.

Defense counsel extensively cross-examined Yan on her identification of Powell. (See, e.g., id. at 688:7-695:7.) Defense counsel attempted to bring out that Yan had originally underestimated Powell's age, (id. at 688:4-6), weight, (id. at 688:15-18), and failed to notice his twelve missing teeth, (see id. at 703:2-4, 1073:5-7.) He also questioned whether she was paying attention to his appearance when he first asked her for a light. (Id. at 691.) Defense counsel further

28

questioned her about whether the robber's face was obscured by his clothing in the elevator. (Id. at 692:18-695:25.) He additionally questioned whether she could see the robber when her glasses got knocked off during the struggle, (id. at 694), and whether the stressful nature of the incident may have corrupted her memory of the robber, (id. at 698:15-18.) He also challenged the reliability of her selection of Powell in the lineup because the suspects were sitting down with their bodies covered. (Id. at 711:22-713:8.)

In his summation, Defense counsel more directly challenged Yan's identification, highlighting that she was of a different race than the Defendant and that the trauma of the robbery may have limited her ability to recall the robber's appearance. (Id. at 1522:20-1532:4.) Justice Margulis's charge included a lengthy instruction on how to weigh the reliability of an eyewitness's identification of the Defendant. (Id. at 1637:17-1640:12.) The charge highlighted specifically how cross-racial identifications may be less reliable, (id. at 1640:1-8), and how the "mental, physical, and emotional state" of the eyewitness can affect the identification, (id. at 1639:10-13.)

Because the jury instructions, defense summation, and cross examination of Yan all encouraged the jury to question whether her identification was credible, it cannot be said that admitting Dr. Franklin's testimony would have raised a reasonable doubt that didn't otherwise exist. As such, Powell was not deprived of the right to put on a defense about his false confession, and the state-court decisions did not contain unreasonable applications of Supreme Court law.

**C. The State Evidentiary Laws Are Not Arbitrary or Disproportionate to Their Purposes**

Powell further argues that, even if the decisions precluding the experts were correct on state law, application of that state law was "arbitrary and disproportionate to the purposes [the rules are] designed to serve." (D.E. # 1 at 54, 61.) However, "the exclusion of evidence [has been found] unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty

29

interest of the accused." Scheffer, 523 U.S. at 308. In any case, "the type of evidentiary ruling challenged in this case is afforded wide latitude by the Constitution." Wade, 333 F.3d at 60. As opposed to "state evidentiary rules leading to the blanket exclusion . . . of categories of evidence when their application is arbitrary or disproportionate to the[ir] purposes," this "ordinary evidentiary ruling[] by [a] state trial court[]" is one "upon which the Court is traditional[ly] reluctan[t] to impose constitutional constraints." Id. (cleaned up).

Powell fails to establish that the application of evidentiary caselaw in these instances infringed on any of his "weighty interests" because the preclusion of the expert witnesses from testifying did not "disable [the] defendant from presenting [his] version of the events for which [he was] on trial." Rock, 483 U.S. at 61. As discussed supra in Section B, there was ample strong evidence at trial that contradicted the theories that Dr. Redlich and Dr. Franklin would have advanced. Furthermore, Powell took multiple meaningful opportunities to advance those theories to the jury himself—squarely presenting his confession as false and repeatedly challenging Yan's identification of him as unreliable. The trial court's decisions to preclude the expert testimony that would have achieved the same effect therefore do not implicate "a sufficiently weighty interest of the defendant to raise a constitutional concern." Scheffer, 523 U.S. at 332 (internal quotation and citation omitted). I therefore decline to disturb the state courts' evidentiary rulings.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied. Because Powell has not made a substantial showing of the denial of any constitutional right, I decline to issue a

certificate of appealability. See 28 U.S.C. § 2253(c); Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). I respectfully direct the Clerk of Court to close the case. SO ORDERED.

Dated: March 26, 2026
       Brooklyn, New York

/s/ Carol Bagley Amon

Carol Bagley Amon
United States District Judge

31